In the
**UNITED STATES DISTRICT COURT**
for the **SOUTHERN DISTRICT OF INDIANA**,
INDIANAPOLIS DIVISION

| | |
|---|---|
| **FORUM CREDIT UNION**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| *vs*. ) | CAUSE NO. 1:10-cv-1621-SEB-DML |
| ) | |
| **DFCU CREDIT UNION**, ) | |
| ) | |
| Defendant. ) | |

# E N T R Y

**Plaintiff's Motion to Stay Arbitration (doc. 9)**
**Defendant's Motion to Compel Arbitration and Stay Action (doc. 16)**
**Plaintiff's Motion for Leave to File Surreply (doc. 25)**
**Defendant's Motion to Strike Amended Complaint *etc*. (doc. 28)**

Plaintiff FORUM Credit Union entered into a loan-participation agreement with Defendant DFCU Financial, another credit union, whereby both entities shared ownership, and funding, of two loans that DFCU made to two of its credit-union members. The agreement included a term requiring DFCU to purchase FORUM's ownership shares if the loans went into default. The loans went into default, DFCU refused FORUM's demand that it buy FORUM's shares in the loans, and FORUM brought this suit for damages. When DFCU commenced an arbitration proceeding with the American Arbitration Association respecting these matters, FORUM filed the present motion to stay the arbitration. DFCU countered with the present motion to stay this action and compel arbitration of the parties' dispute. For the reasons explained herein, we find that the parties' dispute is not subject to arbitration.

1

Because this arbitration dispute arose immediately after service of the complaint,[1] we assume the facts and circumstances as pled by FORUM and as represented by the parties in their briefs. In 2007, DFCU's predecessor[2] (both entities hereinafter referred to as "DFCU") solicited other credit unions to purchase interests in loans that it intended to make to certain of its members. These were loans made to trusts established by elderly, wealthy members in order to fund the members' purchases of high value life-insurance policies. The loans were short term, intended to cover only the first few years of premiums on the policies, after which the policies were to be sold on the open market. DFCU expected the sales of the policies to generate enough revenue to allow the trusts to repay the loans with interest. The loans would be secured by the cash-surrender value and/or proceeds of the underlying life-insurance policies and the loans were to be made without recourse to the trusts or the insured credit-union members.

Two of these loans were intended to be made to DFCU members Gene Phillips and Arlene Kane. DFCU offered to sell a 90% interest in each of the Phillips and Kane loans to FORUM (DFCU retaining the remaining 10% interest). FORUM agreed to buy into the two loans on the condition that DFCU agreed to "repurchase" its ownership interests in the event of a "material event," including the loans going into default. On December 21, 2007, FORUM and DCFU executed a loan-participation agreement (the "2007 Agreement") governing the parties' interests in the Phillips and Kane loans. 2007 Agreement (doc. 1-1 and 17-1). The 2007

---

[1] DFCU has not filed an answer.

[2] In 2009, DFCU merged with Capital Community Credit Union (a.k.a. CapCom Credit Union), acquiring its rights and assuming its liabilities under the agreements that are the subject of this action.

Agreement was written as a general, "master," agreement that would also apply to any future loans in which DFCU and FORUM agreed to participate.[3] The 2007 Agreement included the following repurchase term:

> Section 12.  Repurchase Obligation.
>
> Upon the occurrence of a Material Event (as defined in Section 5) with regard to any loan by [DFCU] to its members pursuant to this Agreement (the "Affected Loan") and the receipt by [DFCU] of the written request of [FORUM] that its participation interest in the Affected Loan be repurchased by [DFCU], [DFCU] will repurchase the participation interest in the Affected Loan from [FORUM] for a price equal to the remaining principal balance of the Affected Loan plus all unpaid interest and fees accrued thereon through the date of repurchase. Such purchase price shall be paid by [DFCU] within thirty (30) days of receiving the written request . . . .

A Material Event was defined to include "[a]ny material change in the value of collateral securing the loan" and "[a]ny failure by the borrower to pay principal and/or interest payments under the loans when due." 2007 Agreement, Section 5. The 2007 Agreement also included the following arbitration term:

> Section 16.  Resolution of Disagreements.
>
> The parties represent that they will use their best efforts to resolve any and all problems in reference to the processing and maintaining of loans in accordance with the terms and provisions of this Agreement. However, in the event the parties cannot reach an agreement on any issue, such dispute, claim or controversy shall, at the request of any party, be resolved by binding arbitration. Arbitration shall be the sole means of resolving such dispute, claim or controversy. The arbitration proceedings shall be conducted in accordance with the rules and regulations of the American Arbitration Association ("AAA"). If any party wrongfully refuses to submit a dispute to arbitration or to abide by the decision of the arbitrator, any other party shall be entitled to recover its costs, including attorney fees, in enforcing these arbitration provisions.

---

[3] Specific loans in which FORUM agreed to participate were to be identified by inclusion in an attached Schedule of Loans and in individual Participation Certificates that DFCU would issue to FORUM. 2007 Agreement (doc. 1-1), Section 1.

Appended to the 2007 Agreement was a Schedule of Loans listing the Phillips and Kane loans. (Doc. 1-1). The Phillips loan was in the total amount of $4,911,250 and FORUM was scheduled to make its 90% participation contributions over three years in the amounts of $2,465,100 in 2007, $1,669,500 in 2008, and $285,525 in 2009. The Kane loan was in the total amount of $1,657,250 with FORUM's scheduled participation contributions in the amounts of $866,700 in 2007, $513,450 in 2008, and $111,375 in 2009.[4] On the day of execution of the 2007 Agreement, FORUM wired $3,331,800 to DFCU as the first of its three fundings for both loans. FORUM alleges that it made all subsequent payments under the Agreement.[5]

In February 2008, the parties executed a new Loan Participation Agreement, (doc. 17-2), which was similar to the 2007 Agreement, a chief difference being that it did not include the Repurchase Obligation. FORUM alleges that, in 2008, due to a change in the life-expectancy tables, the values of the life-insurance policies securing the Phillips and Kane loans changed, which FORUM contends was a Material Event. In October 2008, the parties executed a third Loan Participation Agreement, (doc. 17-3), which, again, was similar to the 2007 Agreement but without the Repurchase Obligation. Both of the loan participation agreements made in 2008

---

[4] A schedule of the loans attached to the October 2008 loan participation agreement (described *infra*) shows an apparent calculation adjustment in the funding of the Kane loan: FORUM's 2008 funding requirement was reduced by $35,550 and its 2009 requirement was increased by the same amount. (Doc. 17-3).

[5] Presumably, FORUM made both of the scheduled funding payments for 2008 and 2009 because its repurchase demand was not made until 2010, after the loans went into default that year. In addition, as discussed *infra*, DFCU asserts only that FORUM breached the agreement by not contributing its proportional share of premiums ($249,165) on one of the life-insurance policies after the loans went into default. Apparently, in order to maintain the life-insurance policies' effectiveness as securities for the loans, the parties began advancing the policy premiums which were not being paid by at least one of the trusts.

4

(collectively, the "2008 Agreement") contained arbitration terms ("Resolution of Disagreement" sections) that were identical to the one in the 2007 Agreement.

In 2010, the Phillips and Kane loans went into default when the borrowers failed to make the principal and interest payments that were due. FORUM claims this was another Material Event under the 2007 Agreement. In June 2010, FORUM invoked the Repurchase Obligation section of the 2007 Agreement and demanded that DFCU repurchase its interest in the loans. DFCU refused.

On December 15, 2010, FORUM filed this action. The Complaint (doc. 1) asserts one count of breach of contract: it claims that DFCU's refusal to repurchase FORUM's interests in the loans was a material breach of the 2007 Agreement. The remedy FORUM seeks includes recovery of all the amounts that it paid for its 90% interest in the loans, all the amounts that it paid for premiums on the underlying life-insurance policies in order to maintain the policies (which secure the loans), and interest on these amounts.[6] Two days later, on December 17, 2010, DFCU filed a Demand for Arbitration with the American Arbitration Association ("AAA"). (Doc. 10-1). In the "nature of the dispute" part of the demand form, DCFU listed (1) breach of contract by FORUM and (2) determination of the parties' respective obligations under the 2007 and 2008 Agreements. DFCU stated the dollar amount of its claim as $249,165. (*Id*.) In a letter to FORUM that same day, DFCU denied any breach of the 2007 and 2008 Agreements, denied that it had any duty to repurchase FORUM's interests in the Phillips and Kane loans, and

---

[6] FORUM has since filed an Amended Complaint, (doc. 24), which adds a second count, for a declaratory judgment. It ask the Court to declare that the 2007 Agreement governs the parties' relationship with respect to the Phillips and Kane loans.

5

demanded that FORUM pay to DFCU the amount of $249,165, which it stated represented FORUM's 90% share of premium payments that DFCU had advanced that month for the Kane life-insurance policy. (*Id*.) Five days later, on December 22, 2010, FORUM filed its present motion to stay the AAA arbitration commenced by DFCU. (Doc. 9). DFCU responded on January 10, 2011 with its motion to stay this action and compel arbitration. (Doc. 16).

FORUM argues that the arbitration process should be stayed because the Resolution of Disagreements section of the 2007 Agreement requires arbitration only of problems or issues regarding the "processing and maintaining" of the loans, and DFCU's obligation to repurchase FORUM's interests in the loans does not relate to the processing or maintaining of those loans. DFCU argues that: (1) the arbitration requirement that appears in both the 2007 and 2008 Agreements is not restricted to issues of "processing and maintaining" the loans, but applies to "any issue" under the Agreements, including any repurchase obligation, and (2) even if the arbitration requirement is interpreted to apply only to "processing and maintaining" of the loans, FORUM's invocation of the repurchase term raises issues involving the maintaining of the loans.[7]

---

[7] Substantively, DFCU contends that it has no duty to repurchase FORUM's interests in the loans because the 2007 Agreement was completely superseded by the 2008 Agreement, which does not include the Repurchase Obligation. FORUM's position is that the 2008 Agreement was intended to apply only to any new loans in which the parties chose to participate after the Phillips and Kane loans. Thus, FORUM argues, the 2007 Agreement is not superseded and it still governs the parties' relative rights and obligations with respect to the Phillips and Kane loans, which means that the repurchase obligation is still effective. Because the same arbitration requirement appears in both the 2007 and 2008 Agreements, and in light of our resolution of the arbitration dispute, this dispute about the continued applicability of the 2007 Agreement need not be addressed at this time.

**Discussion**

Under the Federal Arbitration Act ("FAA"), "a written provision in . . . any contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . or the refusal to perform the whole or any part thereof . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA requires a court to stay any suit or proceeding involving any issue referable to arbitration under a written agreement until the arbitration has been had according to the terms of the agreement. 9 U.S.C. § 3. A party may petition a court for an order compelling arbitration where another party has failed, neglected, or refused to arbitrate. 9 U.S.C. § 4. If the making of the arbitration agreement or a party's failure, neglect, or refusal to arbitrate is in issue, "the court shall proceeding summarily to the trial thereof." *Id*. "If no jury trial be demanded by the party alleged to be in default . . . the court shall hear and determine such issue." *Id*. "Any application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions," except as otherwise provided. 9 U.S.C. § 6.[8]

Arbitrability of a dispute is a question of contract — *i.e.*, whether the parties agreed to arbitrate the matter — because a party cannot be compelled to arbitrate without its consent. *Granite Rock Co. v. Internat'l Brotherhood of Teamsters*, 130 S.Ct. 2847, 2856, 2857, 177 L.Ed.2d 567 (2010). "The question whether the parties have submitted a particular dispute to

---

[8] Neither of the parties demanded a jury trial or an evidentiary hearing on their motions. Both sides relied on the documentary evidence of the 2007 and 2008 Agreements and did not present or any evidence requiring fact-finding on the issue of arbitrability.

arbitration, *i.e.*, the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakable provide otherwise." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 82, 123 S.Ct. 588, 591,154 L.Ed.2d 491 (2002). Both federal and state courts apply federal substantive common law to the issue of the arbitrability of contracts in commerce. *CIGNA HealthCare of St. Louis, Inc. v. Kaiser*, 294 F.3d 849, 855 (7th Cir. 2002). 540 r3 533 Under this common law, "courts apply general state-law principles of contract interpretation to the interpretation of an arbitration agreement within the scope of the [FAA] . . . ." *Volt Information Sciences, Inc. v. Board of Trustees of the Leland Stanford Junior University*, 489 U.S. 468, 475, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488 (1989). *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 1924 (1995).

Issues of arbitrability for judicial resolution are the kind of narrow "gateway" issues that the parties "would likely have expected a court to have decided . . . where they are not likely to have thought that they had agreed that an arbitrator would do so, and, consequently, where reference of the gateway dispute to the court avoids the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate." *Howsam*, 537 U.S. at 83-84, 123 S.Ct. at 592. A court looks not only at the validity of the parties' consents to arbitrate (*i.e.*, formation issues), but whether the parties agreed to arbitrate the specific dispute at issue. *Granite Rock*, 130 S.Ct. at 2857 ("a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*."). Each inquiry is independent: "a disagreement about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy is for the court." *Howsam*, 537 U.S. at 84, 123 S.Ct. at 592. A court should avoid ruling on the potential merits of the underlying claims when deciding whether

the parties have agreed to arbitrate a particular issue. *AT&T Technologies, Inc. v. Communications Works of America*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986).

Because the FAA represents a congressionally declared liberal federal policy in favor of arbitration, any doubts or disagreements about the scope of arbitrable issues should be resolved in favor of arbitration. *Volt*, 489 U.S. at 475-76; *Continental Casualty Co. v. American National Insurance Co.*, 417 F.3d 727, 730-31 (7th Cir. 2005). Courts apply this presumption of arbitrability "only where a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand" and "order[] arbitration only where the presumption is not rebutted." *Granite Rock*, 130 S.Ct. at 2858-59. The presumption of arbitrability also applies to disputes about the validity or enforceability of the whole contract because, unless a party challenges the validity of the arbitration clause itself (*via*, *e.g.*, challenging the formation of the contract), courts must treat arbitration clauses as severable from the rest of the contracts in which they appear. *Granite Rock*, 130 S.Ct. at 2857. Therefore, the cornerstone and first principle of the caselaw on arbitrability is that it "is strictly a matter of consent — and thus that courts must typically decide any questions concerning the formation or scope of an arbitration agreement before ordering parties to comply with it . . . ." *Granite Rock*, 130 S.Ct. at 2857 and n. 5.[9]

---

[9] "[O]ur precedents hold that courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* . . . its enforceabiltiy or applicability to the dispute is in issue. Where a party contests either or both matters, 'the court' must resolve the disagreement." *Granite Rock*, 130 S.Ct. at 2857-58.

The relevant language from the arbitration term — the "Resolution of Disagreements" section — in both the 2007 and 2008 Agreements reads as follows:

> The parties represent that they will use their best efforts to resolve any and all problems in reference to *the processing and maintaining of loans* in accordance with the terms and provisions of this Agreement. However, in the event the parties cannot reach an agreement *on any issue*, such dispute, claim or controversy shall, at the request of any party, be resolved by binding arbitration.

(Emphases added). FORUM argues that the first and second sentences should be read together, meaning that the parties agreed to arbitrate only issues involving the processing and maintaining of the Phillips and Kane loans. DFCU argues that, because these two sentences can be read independently of each other, the scope of the parties' agreement to arbitrate extends to "any issue" and "any claim arising out [of] the Loan Participation Agreement," (Brief in Support of Defendant's Motion to Compel Arbitration and Stay Action (doc. 17) at 5), including the parties' dispute over whether DFCU is obligated to repurchase FORUM's interest in the loans. According to DFCU, the first sentence's reference to "the processing and maintaining of loans" does not address the scope of arbitration, but "only offers a general statement about using best efforts to resolve problems *before* either party initiates arbitration." (*Id.*). DFCU argues that, because its interpretation in favor of arbitration is "arguable," and "*a* reasonable interpretation" — not necessarily the *only* or the *most* reasonable interpretation — the term is susceptible of more than one meaning and, therefore, ambiguous. In that case, the federal presumption in favor of arbitrability dictates that the interpretation in favor of arbitration controls.

Both parties agree that the Court should apply principles of contract interpretation to interpret the arbitration terms, (Plaintiff's Memorandum in Support of Motion to Stay Arbitration (doc. 10) at 6; Defendant's Response Brief in Opposition to Plaintiff's Motion to

Stay Arbitration (doc. 15) at 7), and they have agreed that the 2007 and 2008 Agreements "shall be governed and construed under the laws of the State of Michigan," 2007 Agreement, § 18; 2008 Agreement, Governing Law. FORUM briefed relevant Michigan principles of interpretation, without contradiction or addition by DFCU. Under Michigan law, a court's goal in interpreting a contract is to discern the parties' mutual intent. *Warner v. DSM Pharma Chem. N.A., Inc.*, No. 1:07-cv-302, 2010 U.S. Dist. LEXIS 3496, *6 (W.D. Mich., Jan. 19, 2010) (citing *Quality Prods. & Concepts v. Nagel Precision, Inc.*, 666 N.W.2d 251, 259 (Mich. 2003). A contract should be construed as a whole. *Klapp v. United Insurance Group Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003); *Florida Canada Corp. v. Union Carbide & Carbon Corp.*, 280 F.2d 193, 195-96 (6th Cir. 1960) ("the intention of the parties is to be gathered from the entire instrument and not from detached portions"). "[W]here a contract has several stipulations, the intention of the contracting parties is not expressed by any single clause or stipulation, but by every part and provision in it, which must all be considered together, and so construed as to be consistent with every other part." *Johnston v. Miller*, 40 N.W.2d 770, 771-72 (Mich. 1950) (quoting *Prowant v. Sealy*, 187 P. 235 (Okla. 1919)). In addition, "[i]t is a cardinal principle of construction that a contract is to be construed as a whole; that all its parts are to be harmonized so far as reasonably possible . . . ." *Associated Truck Lines, Inc. v. Baer*, 346 Mich. 106, 110, 77 N.W.2d 384, 386 (Mich. 1956). *South Macomb Disposal Authority v. American Insurance Co.*, 225 Mich. App. 635, 653, 572 N.W.2d 686 , 695 (Mich. App. 1997) ("Conflicts between clauses should be harmonized, and a contract should not be interpreted so as to render it unreasonable").

The parties' intent as shown by the whole contract prevails over the literal sense of the terms used in it. *Turner v. Bituminous Casualty Co.*, 244 N.W.2d 873, 896 (Mich. 1976).

"[T]he intention of the parties to an instrument, when that intent is apparent from the entire instrument . . . , will control the meaning of any particular word or phrase unguardedly used and seeming to indicate a different intention." *Klever v. Klever*, 52 N.W.2d 653, 658 (Mich. 1952).

A construction that is reasonable and fair will prevail over one that is unusual and extraordinary. *B. Siegel Co. v. Wayne Circuit Judge*, 149 N.W. 1015, 1018 (Mich. 1914). The "courts will not interpret a contract in a manner which would impose an absurd or impossible condition on one of the parties." *Port Huron Area School District v. Port Huron Education Association*, 327 N.W.2d 413, 415 (Mich. App. Ct. 1982).

Applying this law, FORUM argues that the term "any issue" in the second sentence of the Resolution of Disagreements section must be read in the context of the immediately preceding first sentence of the paragraph. According to FORUM, the first sentence's statement that the parties will use their best efforts to resolve any problems with the processing and maintaining of the loans leads into and qualifies the second sentence, which means that the parties agreed to arbitrate only unresolved disputes over the processing and maintaining of the loans. DFCU does not dispute the applicable Michigan law or, in fact, the reasonableness of FORUM's interpretation. Rather, it argues that, because it has advanced a reasonable alternative interpretation of the Resolution of Disagreements term that reads its first two sentences independently, the term "any issue" is susceptible of more than one meaning and, therefore, ambiguous, which invokes the federal presumption of arbitrability in its favor.

DFCU's understanding of ambiguity under Michigan law is flawed. Not every reasonable interpretation of or disagreement over the meaning of a contract creates ambiguity.

12

"A term is ambiguous 'when it is *equally* susceptible to more than a single meaning,' not when reasonable minds can disagree regarding its meaning." *Toll Northville LTD v. Township of Northville*, 480 Mich. 6, 15 n. 2, 743 N.W.2d 902, 908 n. 2 (Mich. 2008) (original emphasis; citation omitted). Addressing ambiguity of statutory terms, but recognizing the same rules govern the interpretation of contracts,[10] the Michigan Supreme Court held:

> [T]he dissent entirely misstates the standard for discerning ambiguity. The dissent would hasten findings of "ambiguity" by courts by predicating these findings on the basis of whether "reasonable minds can differ regarding" the meaning of a statute. Especially in the context of the types of cases and controversies considered by this Court — those in which the parties have been the most determined and persistent, the most persuaded by the merits of their own respective arguments — it is extraordinarily difficult to conclude that reasonable minds cannot differ on the correct outcome. That is not, and has never been, the standard either for resolving cases or for ascertaining the existence of an ambiguity in the law. The law is not ambiguous whenever a dissenting (and presumably reasonable) justice would interpret such law in a manner contrary to a majority. Where a majority finds the law to mean one thing and a dissenter finds it to mean another, neither may have concluded that the law is "ambiguous," and their disagreement by itself does not transform that which is unambiguous into that which is ambiguous. Rather, a provision of the law is ambiguous only if it "irreconcilably conflict[s]" with another provision, or when it is *equally* susceptible to more than a single meaning. In lieu of the traditional approach to discerning "ambiguity" — one in which only a few provisions are truly ambiguous and in which a diligent application of the rules of interpretation will normally yield a "better," albeit perhaps imperfect, interpretation of the law — the dissent would create a judicial regime in which courts would be quick to declare ambiguity and quick therefore to resolve cases and controversies on the basis of something other than the words of the law.

*Mayor of City of Lansing v. Michigan Public Service Commission*, 470 Mich. 154, 165-66, 680 N.W.2d 840, 847 (Mich. 2004). Under Michigan law, ambiguity is a finding of last resort, to be made only after all the conventional rules of contract interpretation have been exhausted. *Id*.; *Klapp v. United Insurance Group Agency, Inc.*, 468 Mich. 459, 474, 663 N.W.2d 447, 456

---

[10] *Mayor of Lansing*, 470 Mich. at 165 n. 6, 680 N.W.2d at 846 n. 6.

(Mich. 2003); *Lafarge Midwest, Inc. v. City of Detroit*, — N.W.2d —, 2010 WL 3984562 (Mich. App., Oct. 12, 2010).

Reading the Agreement as a whole, and particularly the context of the first two sentences of the Resolution of Disagreements paragraph, we conclude that the term "any issue" is not equally susceptible of two meanings. Reading the first sentence in isolation from the second would be a strained interpretation. There is no reason evident in the Agreement, or suggested by DFCU, why the parties would have specifically undertaken to use their best efforts to resolve any problems or issues related to only the processing and maintaining of the loans, yet agreed to arbitrate all problems or issues related to any term of the Agreement. Attached to each other, as they are, the better, the more reasonable interpretation, and the more likely representative of the parties' original intentions, is that the first and second sentences must be read together, as related to each other. Thus, the "any issue" that must be arbitrated is any problem in reference to the processing or maintaining of the loans that remains unresolved despite the parties' best efforts.

This interpretation is supported by the use of "however" to introduce the second sentence as this usage indicates a substantive relationship between the two sentences, the second referring back to and following or expanding upon the first. *See Rosenthal v. Quadriga Art, Inc.*, 69 A.D.3d 504, 508, 894 N.Y.S.2d 32, 35 (N.Y. App. Div. 2010) ("In considering the context of the phrase at issue, it is noteworthy that the second paragraph covering the event of termination begins with the word 'however.' Because 'however' is a transitional term, it automatically refers the reader back to the preceding clause."); *UnitedHealth Group Inc. v. Columbia Casualty Co.*, No. 05-cv-1289 (PJS/SRN), 2010 WL 317521 (D. Minn., Jan. 19, 2010) ("Beginning the clause

with 'however' strongly suggests that it is meant to narrow the exclusion that appears in the preceding clause"); *Marx v. Clear Channel Broadcasting, Inc.*, 887 So.2d 405, 406 (Fla. App. 4 Dist. 2004);[11] *Elkhart Lake's Road America, Inc. v. Chicago Historic Races, Ltd.*, 158 F.3d 970 (7th Cir. 1998) ("In the context of paragraph 1 and in the context of the contract as a whole, the phrase 'cancel any year' is not readily susceptible to more than one meaning. Through the use of the adverb 'however,' the phrase refers back to the preceding sentence, which sets the term of 'this agreement' as three years. Thus, the antecedent to 'any year' is 'this agreement.'"). The use of "however" indicates that "any issue" means "any issue in reference to the processing and maintaining of loans."

This interpretation is further buttressed by the second sentence's phrasing of the arbitration trigger in terms of "in the event the parties cannot reach an agreement" because the most likely, the most natural reading is that this phrase refers to the parties' promises to "use their best efforts to resolve any and all problems." If the second sentence were independent and the arbitration requirement applied to any and all issues arising under or out of the Agreement, in addition to the processing and maintaining of the loans, then the phrase "in the event the parties

---

[11] "The introductory adverbial phrase in the second sentence (''the foregoing notwithstanding however'') and the use of the qualifying adverb *however* in the third sentence of the non-assignability provision have the effect of requiring that the three sentences be read sequentially, rather than all at once together. That is, one starts with the first sentence and learns that the agreement binds the heirs and successors of both parties. But the second sentence begins by displacing the first sentence of some effect (''The foregoing notwithstanding however''), referring uniquely to Cole, providing that *only he* benefits if there is a sale of the station but that he is bound by the agreement. The third sentence then provides rather clearly that no rights under the contract may be assigned. Looking backward from the third sentence, and giving the text of the full paragraph its due, reading the three sentences sequentially — as they obviously were intended to be — . . . ."

15

cannot reach an agreement on any issue" would be meaningless surplusage because resort to arbitration presupposes that the parties have not agreed on a resolution. But the phrase makes sense as a reference to and reiteration of the parties' obligations to use their best efforts to resolve problems with the processing and maintaining of the loans. If the second sentence were independent and intended to create a general, all-encompassing arbitration requirement, it is more reasonable to expect that the introductory verbiage would be absent and the sentence would read simply and directly in terms such as: "Any dispute, claim, or controversy shall, at the request of any party, be resolved by binding arbitration."

Finally, our interpretation of the paragraph is supported by the fact that the parties did not utilize the standard broad arbitration language recommended by the American Arbitration Association, whose services the parties explicitly agreed to utilize. *See Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 640 (7th Cir. 2002).[12]

We conclude that the term "any issue" in the second sentence of the Resolution of Disagreements paragraph is not "*equally* susceptible to more than a single meaning" and is, therefore, not ambiguous. We find that the better and more reasonable interpretation, and the one that more likely comports with the parties' intentions, is that the issues of which the paragraph mandates arbitration are issues or problems regarding the processing and maintaining

---

[12] "While the strong presumption in favor of arbitration compels us to construe § 3.5 broadly, we cannot push it as far as MedQuist would prefer while still making sense of the agreement. The parties here did not — either intentionally or through carelessness — employ the nearly universal language recommended by the American Arbitration Association and referred to in countless court decisions that would obviously have encompassed all of Welborn's claims in this case, since all of them arise out of or relate to the contract."

of the Phillips and Kane loans.

DFCU argues that, even under this interpretation, FORUM's breach-of-contract suit to enforce the 2007 Agreement's repurchase obligation is still arbitrable because it involves the processing or maintaining of the loans. But it offers little explanation of how DFCU's obligation to repurchase FORUM's interests in the Phillips and Kane loans implicates either the processing or maintaining of those loans. DFCU merely asserts that it is unreasonable to suggest otherwise and that FORUM's claim "pertains to alleged loan defaults and how the loans are required to be maintained under the terms of the Loan Participation Agreement following an event of default." (Brief in Support of Motion to Compel Arbitration (doc. 17) at 5; Response to Motion to Stay Arbitration (doc. 15) at 6). DFCU does not explain, in the context of the terms of the Agreement, what it means by the loans being "maintained" following a default. It is not self-evident and we will not construct the explanation or argument for DFCU. At any rate, DFCU's contention that FORUM's claim is only about the loans' defaults is too narrow. FORUM's suit seeks damages for DFCU's alleged failure to fulfill its obligation under the 2007 Agreement to purchase FORUM's 90% shares in the Phillips and Kane loans, which obligation was allegedly triggered by the loans' defaults. Therefore, the loan defaults are relevant to FORUM's suit only insofar as they are the material events that enabled FORUM to invoke DFCU's repurchase obligation. DFCU has not explained how FORUM has any interest in, or this suit involves, any aspect of the loans after their defaults and DFCU's repurchase obligation have been proven.

A review of the 2007 and 2008 Agreements reveals the most reasonable and likely meaning of the phrase "processing and maintaining of loans." Section 5 of the 2007 Agreement,

17

entitled "Servicing of Loans and Record Keeping," provides that DFCU has the duty to "service all loans and *maintain* records on all loans made pursuant to this Agreement." (Emphasis added). DFCU, through a third-party processor, will mail all necessary statements to borrowers and report interest paid by the borrowers as required by the Internal Revenue Code. DFCU also represents that all loans "will be *processed* and serviced, in all respects, in accordance with" legal requirements. (Emphasis added). Section 6 of the Agreement provides that DFCU shall be responsible for the "collection, *processing*; and/or remittance" of the borrowers' payments of principal and interest. (Emphasis added). The Agreement also provides for monthly loan status reports (Section 8) and perfecting security for the loans (Section 11).

Reading the Agreement as a whole, and the Resolution of Disagreements section in the context of these other sections, we conclude that the most reasonable interpretation of the phrase "processing and maintaining of loans" in the first sentence of Section 16 is that it refers to the myriad administrative and ministerial functions of servicing, processing, and maintaining the loans as described, in part, in Sections 5, 6, 8, and 11. DFCU has not shown another reasonable interpretation, let alone that the phrase is *equally* susceptible to more than one meaning. Because this interpretation of processing and maintaining the loans does not include any aspect of DFCU's obligation to repurchase FORUM's ownership interest in the loans following a material event, FORUM's claim in this suit does not implicate the 2007 Agreement's requirement of arbitration.

## Conclusion

Because DFCU has not shown that FORUM's claim is subject to binding arbitration,

18

DFCU's motion to compel arbitration and to stay this action (doc. 16) is **DENIED** and FORUM's motion to stay the arbitration proceeding initiated by DFCU (doc. 9) is **GRANTED**. DFCU is ordered to advise the AAA of this ruling and to dismiss the arbitration proceeding. FORUM's motion for leave to file a surreply (doc. 25) is **DENIED** as moot. Because DFCU's motion to strike FORUM's amended complaint (doc. 28) is premised on the arbitration issues argued and resolved on the present motions, it is **DENIED** as moot.

**SO ORDERED.**

Date: 03/29/2011

*[signature]*

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Alice McKenzie Morical
HOOVER HULL LLP
amorical@hooverhull.com

Scott E. Murray
BARNES & THORNBURG LLP
smurray@btlaw.com

Patrick James Olmstead Jr.
HOOVER HULL LLP
polmstead@hooverhull.com

Apryl E. Underwood
BARNES & THORNBURG LLP
apryl.underwood@btlaw.com